## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

**DARRELL GRIFFIN,**

       **Plaintiff,**

v.                                    **Case No. 3:15-cv-1209-J-20MCR**

**CITY OF JACKSONVILLE, FLORIDA;**
**and LAURA STAGNER, individually,**

       **Defendants.**

_____/

## O R D E R

    This cause is before this Court on Defendants' "Motion for Final Summary Judgment and Accompanying Memorandum of Law" (Dkt. 24), Plaintiff's Response (Dkt. 31), and Defendants' Reply to Plaintiff's Response (Dkt. 36).

    This case arises from a two count Amended Complaint alleging a violation of Plaintiff's rights under 42 U.S.C. §§ 1981, 1983. In Count I, Plaintiff, who is black, alleges Defendant Stagner intentionally discriminated against him on the basis of race by failing to disclose to the City Council Auditor an alleged policy which permitted the contract violations found by the auditor, and that the City failed to discipline white employees who purportedly engaged in the same or similar conduct identified in the audit. In Count II, Plaintiff maintains Defendant City of Jacksonville discriminated against him on the basis of race by "demoting" him based on the findings of an audit.

## I. Background

Plaintiff has been employed with the City of Jacksonville ("the City") since March 1989. Over his 27 years with the City, Plaintiff held various civil service and appointed positions of increasing responsibility, including serving as Division Chief under two different mayors.

In 2007, Plaintiff was appointed to the position of Affordable Housing Coordinator ("AHC") in the City's Housing and Community Development Division ("HCDD"). In this position, Plaintiff served at the pleasure of the Mayor. But since Plaintiff previously held a civil service position, he enjoyed the right to revert back to that position if and when Plaintiff was removed from his appointment.

Every year, the City receives millions of dollars in federal and state grants for affordable housing and related services, which the HCDD administers. As AHC, Plaintiff was a Program Manager responsible for the Rental Rehabilitation Program, one of the City's affordable housing programs. The procurement regulations of the federal or state "funding source" and the HCDD's program guidelines dictate the "activities" or type of projects on which grant funds could be spent.

As part of his duties, Plaintiff administered grant funds from the State Housing Initiatives Partnership ("SHIP"), a state funding source, to rehabilitate rental housing for low-income families. Although Plaintiff reported to the head of the HCDD and was subject to HCDD guidelines and procedures, his position was semi-autonomous. As a Program Manager, Plaintiff was "responsible for overall compliance" of Rental Rehabilitation Program projects from start to finish, regardless of the funding source.

To begin a Rental Rehabilitation project, a for-profit developer or non-profit entity applied for SHIP funds to rehabilitate its property. The contract was entered into between the

2

City and the non-profit/developer, therefore the project was subject to competitive written quotes or bids pursuant to Chapter 126 of the City's Municipal Code ("Procurement Code").

All City contracts contain conflict of interest and procurement provisions. The purpose of these provisions is to protect the City from paying inflated prices and to ensure an open, fair and competitive process. The conflict of interest provision prohibits a non-profit/developer from hiring a contractor with which it has a conflict of interest. Depending on the dollar amount of the project, the bid provision requires the HCDD to obtain a certain number of written quotes or the work should be competitively bid. Plaintiff drafted and/or had significant input on the guidelines, application, procedures and contracts for the Rental Rehabilitation Program.

Although the Rental Rehabilitation Program application and internal guidelines state that the Procurement Code, a local law, should be followed, Plaintiff asserted his department's internal guidelines did not follow the Procurement Code. Plaintiff maintained his internal guidelines supersede the City's Procurement Code and the terms of the contract could be waived in certain circumstances.

As Director of Finance, Laura Stagner is responsible for HCDD's accounting, ensuring that funding for a project is in place, handling the closing and disbursement of funds and post-completion compliance. As HCDD administers over 100 contracts a year, the head of the Division and Stagner cannot oversee every project to make sure it complies with applicable federal, state or City procurement regulations, the terms of the particular contract, and HCDD's guidelines. As the head of HCDD and Stagner were not Program Managers, they were not involved in the day-to-day administration of HCDD's programs. Plaintiff was responsible for receiving applications, reviewing them and the due diligence associated with each project. Plaintiff conceded Stagner had no involvement with how many bids were received or the

3

contractors chosen for a project. Stagner and Ray, HCDD's paralegal, did not review Plaintiff's work before the contract was finalized. Plaintiff, as AHC and Program Manager, was trusted to comply with the law.

### A. Audits #769 and #779

On September 23, 2015, the Council Auditor's Office issued a final report (Audit #769) on the SHIP program covering the period of 10.1.2009 to 9.30.2012. Thomas Carter, Public Accounts Auditor, conducted the audit, which was a follow-up to a pre-2004 audit, in accordance with the auditor's usual procedures.

On October 6, 2014, Carter held an exit conference with Chief Elaine Spencer, Plaintiff, Stagner, and Dayatra Coles, the SHIP Administrator. During this meeting, Carter read each of the record of audit findings ("RAFs") and gave them an opportunity to comment on the preliminary findings. Carter explained that on four of the projects Plaintiff administered as Program Manager, the conflict of interest provision of the Procurement Code, the SHIP Program rules, and the contract terms were violated. On nine of the projects, all of which Plaintiff administered as Program Manager, the correct number of quotes had not been received in violation of the Procurement Code, the SHIP Program rules, and the contract.

Plaintiff responded to the first finding (Finding 3-2 in the final audit) by stating, "That's fine" and "Agreed. Currently changing policy." To the second finding (Finding 3-3 in the final audit), Plaintiff responded, "Will investigate" and then "Agreed." Plaintiff did not disagree with or deny either preliminary finding. Plaintiff conceded that he never told Carter about a policy allowing conflicts of interest, and that he just said, "that was our policy at the time, but we don't do it that way anymore." Carter recalled that Stagner asked Plaintiff "Are you sure that's all you

4

want to say?"; to which Plaintiff responded, "yes." Coles recalled Plaintiff said generally, "It is what it is."

Based on the auditor's concerns and findings from the October 2014 meeting, Stagner and Coles worked to address the RAFs by gathering missing documents and correcting deficiencies. Plaintiff, however, did not provide any information or documents about self-performance to Carter before the final audit report was issued.

After finishing the field work on April 25, 2015, the auditors prepared a draft audit report, which found Plaintiff had: allowed conflicts of interest; a violation of the Procurement Code; and he did not enforce the contract or the grant. The Council Auditor stated that the bid/quote process should be followed whenever a third party contracts with the City, and there is no authority for an employee or department to create internal policies that conflict with the Code, the grant or the contract. The auditors independently recommended that the Administration investigate Plaintiff for improperly permitting conflicts of interest and determine if discipline was warranted.

While the audit had other findings, none of the other findings related to an actual violation of the Procurement Code, a local law, or the terms of a contract. The term "self-performance" never arose during the audit and the first time the Council Auditor heard the term was post-audit. However, even if the auditors had been shown a policy, it would not have changed their findings.

Plaintiff conceded that he never asked Stagner to notify Carter that there was a policy to self-perform. Plaintiff admitted that he was "absolutely" responsible for reviewing and approving the contracts. Further, Plaintiff admitted that he failed to ensure that the correct number of bids were obtained in nine projects reviewed by the auditor. Plaintiff, additionally, admitted that the

5

conflict of interest provision of four contracts were violated on their face. While Plaintiff has pointed to internal NSP guidelines that allow self-performance, he had not identified any SHIP Program guidelines allowing self-performance. The SHIP Program and NSP are administered in substantially different ways and have different rules. Additionally, the NSP contracts Plaintiff cites in this case involved sealed, competitive bids. This ensured fairness among bidders. In any case, the internal NSP policy provided that a developer which was also a contractor could self-perform, not that a separate construction company with ties to the non-profit/developer could self-perform. This latter situation was the type of conflict of interest violation identified in the audit.

Plaintiff also alleges that owner-occupied rehabilitation projects (such as the Utility Tap-in Program ("UTIP") and the Limited Repair Program ("LRP)), where the contract would be between the property owner and the contractor, are examples of self-performance. In that case, there was no formal bidding process and a homeowner could select the contractor of his/her choice to perform the work from a list of qualified contractors maintained by the Division. While Plaintiff requested an exemption from the Procurement Code for that type of project, he did not request a similar exemption for the nine contracts identified in the SHIP audit.

Since the audit had disclosed serious issues, Sherman delivered a copy of the draft SHIP audit report to Sam Mousa, the City's Chief Administrative Officer ("CAO"). Mousa met with Stagner, the Interim Chief of HCDD, and Folks Huxford, the Acting Director of the Planning Department, which had oversight of HCDD. Mousa asked Stagner to take the lead in preparing HCDD's responses to the audit for his review and editing before the final response was submitted to the auditors. Mousa did not instruct Stagner to discuss the draft audit report with Plaintiff or to obtain his response to the findings. The Administration's response to the

6

recommendation to investigate and possibly discipline Plaintiff came from the Mayor's Office. Stagner did not know about or recommend that the Administration pursue disciplinary action against Plaintiff.

In accordance with the customary practice, the auditors sent the final report on the SHIP audit to the Jacksonville City Council, to the Administration, City department heads and the media, and the audit was posted on the City's website. As a final audit is a public record, the individuals referred to in an audit are often named in the media.

On June 21, 2016, the Council Auditor's Office released Audit #779 (Affordable Housing Consultant Service Audit). This audit related to whether $400,000 of bond funds designated for a Council Member's district had been inappropriately spent on a consulting contract. The auditors did not find any ethical violation by Stewart, the Director during part of the time period the audit covered, or by former Director Greger, who is no longer employed with the City. The contracts were awarded at publicly noticed, Sunshine meetings in an open, five-person committee process. Moreover, unlike Plaintiff, Stewart had been a high-level signatory on the contract and was not involved in its day-to-day administration. Sherman brought Audit #779 to the attention of Mousa, but neither the Council Auditors nor Mousa gave Stewart an opportunity to respond to the audit. Mousa personally responded to Audit #779 and agreed that discipline was not warranted for the same reasons as the Council Auditor. Mousa did not share his response to Audit #779 with Stewart or request her input.

### B. Plaintiff's Resignation and Reversion

During changes in administrations, all appointed employees with the City are required to submit a resignation letter. The new Administration then determines whether a given employee will keep their position. While styled as resignation letters, appointed employees are not given a

7

choice in whether they will submit a resignation letter or ultimately keep their position. When the SHIP audit was finalized, Plaintiff—along with virtually every other appointed employee at the City-had a resignation on file with the new Administration.

Mousa agreed with the auditor's recommendation that Plaintiff should be investigated and potentially disciplined. Since Plaintiff was responsible for the day-to-day administration of the program referenced in the SHIP audit and because the audit revealed Plaintiff allowed procurement, conflict of interest, and contract violations to occur, Mousa decided that he had to take action regarding the audit and remove Plaintiff from the AHC position. Stagner had nothing to do with Mousa's decision and did not influence him in any way. The Employee and Labor Relations Division of Employee Services ("HR") under the direction of Dan Rieves, the Chief of the Division, conducted the investigation. Before HR commenced the investigation, Mousa decided to offer Plaintiff the option of resigning, in which case the City would not proceed with an investigation. Plaintiff rejected the offer to resign. Therefore, the City proceeded with the investigation, during which time Plaintiff was placed on administrative leave.

The decision to remove Plaintiff from the AHC position, to place him on administrative leave, and to allow him to exercise his reversion rights was entirely Mousa's decision. None of Mousa's decisions were based on Plaintiff's race. HR had only been investigating Plaintiff for about 2 ½ weeks when the City's Inspector General ("OIG") asked HR to stop the investigation because OIG was investigating the same matter. The OIG investigation is still pending.

Since HR never completed its investigation or arrived at any final conclusions, the City did not discipline Plaintiff. Plaintiff was interviewed by HR and allowed to submit a response. By Plaintiff's own admission, the first time he submitted anything in writing purporting to show

8

that there was a policy allowing self-performance was when HR interviewed him as part of the investigation.

Plaintiff acknowledged that the City had the right to accept his resignation, but he believed the City's attempt to fire him and "demoting" him were adverse employment actions. Upon Plaintiff's return to work on September 8, 2015, the City reverted him to a civil service position with a lower salary. Plaintiff was replaced as AHC by Coles.

## II. Standard of Review

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Where the nonmoving party bears the burden of proof at trial, the moving party may discharge this 'initial responsibility' by showing that there is an absence of evidence to support the nonmoving party's case or by showing that the nonmoving party will be unable to prove its case at trial." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004). If the moving party does so, the nonmoving party "must come forward with evidence sufficient to withstand a directed verdict motion." *Id.*

In other words, the entry of summary judgment is appropriate "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In making this determination, a court "'must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence.'" *Hinson v. Clinch Cty., Ga. Bd. of Educ.*, 231 F.3d 821, 826-27 (11th Cir. 2000) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)). "'[T]he court should give credence to the evidence

favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Id.* at 827 (quoting *Reeves*, 530 U.S. at 151). "In other words, [the court] must consider the entire record, but 'disregard all evidence favorable to the moving party that the jury is not required to believe.'" *Id.* (quoting *Reeves*, 530 U.S. at 151).

However, the nonmoving party "may not rest upon the mere allegations or denials in its pleadings. Rather, its responses . . . must set forth specific facts showing there is a genuine issue for trial. A mere 'scintilla' of evidence supporting the opposing party's position will not suffice." *Walker v. Darby*, 911 F.2d 1573, 1576-77 (11th Cir. 1990).

## III. Analysis

The City and Stagner maintains they are entitled to summary judgment for the following reasons: 1) Plaintiff cannot establish a *prima facie* claim for race discrimination, 2) that Plaintiff cannot show that the City's legitimate, non-discriminatory reason was pretextual, and 3) that Plaintiff cannot establish a Constitutional violation under § 1983 and Stagner is entitled to qualified immunity.

### A. Race Discrimination

Although Plaintiff is a member of a protected class and was qualified for the position of AHC, according to the City, he cannot demonstrate the other elements of a *prima facie* case of race discrimination. Plaintiff cannot show that he has suffered an adverse employment action.

"'The elements of a cause of action under § 1981 are: '(1) that the plaintiff is a member of a racial minority; (2) that the defendant intended to discriminate on the basis of race; and (3) that the discrimination concerned one or more of the activities enumerated in the statute.'" *Lopez*

*v. Target Corp.*, 676 F.3d 1230, 1233 (11th Cir. 2012) (quoting *Kinnon v. Arcoub, Gopman & Assocs., Inc.*, 490 F.3d 886, 891 (11th Cir. 2007).

A plaintiff may rely on direct or circumstantial evidence to establish a § 1981 race discrimination claim. Where, as here, a plaintiff chooses the circumstantial evidence route, this Court "applied the burden-shifting framework set forth by the Supreme Court . . . ." *Flournoy v. CML-GA WB, LLC*, 851 F.3d 1335, 1339 (11th Cir. 2017) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and *Texas Dep't of Comty. Affairs v. Burdine*, 450 U.S. 248 (1981)). This "framework" provides that "plaintiff bears the initial burden of establishing a prima facie case, which creates a rebuttable presumption of discriminatory intent." *Id.* A defendant "must then rebut that presumption by producing evidence of a legitimate, nondiscriminatory reason for its action." *Id.* Should that defendant bear "its burden of production, plaintiff must establish that defendant's proffered reason is but a pretext for unlawful discrimination." *Id.*

Under *McDonnell Douglas*, a plaintiff must first create an inference of discrimination by establishing a *prima facie* case. *Williams v. Motorola*, 303 F.3d 1284, 1293 (11th Cir. 2002). In this case, Plaintiff claims that the City discriminated against him by treating him differently than other white employees. Therefore, to establish a *prima facie* case, Plaintiff must show: (1) he is a member of a protected class; (2) he was qualified for the position or benefit sought; (3) he was subject to an adverse employment action; and (4) he suffered from a differential application of work or disciplinary rules. S*pivey v. Beverly Enters., Inc.*, 196 F.3d 1309, 1312 (11th Cir.1999), *abrogated on other grounds*; *see Burdine*, 450 U.S. at 252, 257.

Once a plaintiff sets forth a *prima facie* case, the employer must proffer a legitimate, non-discriminatory reason for its actions. *Burdine*, 450 U.S. at 256; *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000). If the employer presents a legitimate reason, the burden

11

shifts back to the plaintiff to produce "sufficient evidence to find that the employer's asserted justification is false" and in reality, a pretext for unlawful, intentional discrimination. *Id.* at 148.24 In order to survive a motion for summary judgment, a plaintiff must establish both a *prima facie* case and evidence sufficient for a jury to find that the employer's proffered explanation is false. *Id.* at 147–48.

The City maintains Plaintiff has not established a *prima facie* case because he was not subjected to an adverse employment action and he was not treated any differently than other employees. Plaintiff responds that the reduction in pay and job responsibility is obviously an adverse employment action regardless of how the City attempts to classify it. Furthermore, Plaintiff points to Stewart as a similarly situated employee who was treated differently. Stewart, a white female, who was audited for violating procurement policies in the housing department and making a contract with a conflict of interest, but not disciplined, according to Plaintiff.

### i. Adverse Employment Action

Plaintiff's reversion to a civil service position, even one with a lower pay scale, was not an adverse employment action because it was not a disciplinary or performance-based "demotion," according to the City. Plaintiff acknowledged as an appointed employee, he could be removed his position for any reason or no reason at all. Moreover, Plaintiff voluntarily submitted a letter of resignation, which the City had a right to accept. Furthermore, since the City never completed its investigation, Plaintiff's removal was not due to discipline.

After the City removed Plaintiff, the only right he was entitled to was the right to revert to the same or a comparable civil service position he held before he was appointed. The City did not deny him that right. Where an employer merely investigates an employee or considers

12

proposed discipline without implementing it, the employee has not suffered an adverse employment action.

"An employment action is considered adverse only if it results in some tangible, negative effect on the plaintiff's employment. The question of whether an employment action is adverse is objective: the plaintiff must demonstrate that a reasonable person in his position would view the employment action in question as adverse." *Williams v. Alabama Dep't of Corr.*, 649 F. App'x 925, 928 (11th Cir. 2016), *cert. denied*, 137 S. Ct. 1134 (2017) (internal citations and quotations omitted).

In the context of a due-process claim, the Eleventh Circuit has stated regarding voluntary resignation, "As an initial matter, employee resignations are presumed to be voluntary. This presumption will prevail unless the employee comes forward with sufficient evidence to establish that the resignation was involuntarily extracted." *Hargray v. City of Hallandale*, 57 F.3d 1560, 1568 (11th Cir. 1995) (internal citations, quotations and marks omitted). "An employee's resignation will only be deemed involuntary where the employer (1) forces the resignation by coercion or duress, or (2) obtains the resignation by deceiving or misrepresenting a material fact to the employee." *Id.* at 1568. In circumstances where an employee has a choice or an alternative, even if the choice is unpleasant such as whether or not to face criminal charges, it will not be deemed a forced resignation. *Id.*

The record before this Court is clear that Plaintiff had an alternative to resignation—he was entitled to exercise his reversion rights, which meant he had a choice and could have continued his employment if the Administration decided to accept his resignation. In this case, there is no evidence that Plaintiff submitted a letter of resignation under coercion or duress or that he had no choice. Plaintiff admitted that the City had the right to remove him from his

13

appointed position, and that the removal decision as well as the reduced pay he received upon reversion was not, in and of itself, discriminatory. Under these circumstances, Plaintiff's voluntary resignation and non-disciplinary reversion was not an adverse employment action.

### ii. Similarly Situated

As explained above to establish a *prima facie* case, Plaintiff must show he suffered from a differential application of work or disciplinary rules. Consequently, a plaintiff must demonstrate that he or she is a member of a protected class and "either (a) that he did not violate the work rule, or (b) that he engaged in misconduct similar to that of a person outside the protected class, and that the disciplinary measures enforced against him were more severe than those enforced against the other persons who engaged in similar misconduct." *Jones v. Gerwens*, 874 F.2d 1534, 1540 (11th Cir. 1989).

Plaintiff seeks to prove intentional discrimination thought the use of selectively enforced rules, or that he was not treated similarly to the City's non-minority employees. To make a legitimate comparison of "the plaintiff's treatment to that of non-minority employees, the plaintiff must show that he and the employees are similarly situated in all relevant respects. In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997) (internal citations removed).

Plaintiff points to Stewart as a similarly situated employee who was treated differently.[1] Stewart, a white female, who was audited for violating procurement policies in the housing department and making a contract with a conflict of interest, but not disciplined, according to Plaintiff.

As the City points out, Stewart was not similarly situated to Plaintiff with regard to position or job duties. Plaintiff was a Program Manager responsible for the day-to-day administration of the affordable housing programs he administered. Plaintiff admitted that other Program Managers were his comparators, not Stewart who had general, high-level oversight of the HCDD and were not responsible for day-to-day operations. Further, the auditors did not find any ethical violation by Stewart during part of the time period the audit covered. The contracts at issue in the Stewart audit were awarded at publicly noticed, Sunshine meetings in an open, five-person committee process.

In addition, the quality of the alleged misconduct is not nearly identical, as the law requires. The courts have rejected the contention that "the violation of any work rule provides a comparator." *Melton v. National Dairy L.L.C.*, 705 F.Supp.2d 1303, 1319 (M.D. Ala. 2010). The SHIP audit found that no other employee violated the Procurement Code or the contract terms. The other deficiencies the auditors noted in the audit did not rise to the same level of seriousness or could not be attributed to one person. In contrast, the auditors found that Plaintiff allowed conflicts of interest and bidding irregularities to take place with regard to the contracts he was responsible for administering. As Plaintiff admitted this was the case, there is no dispute that the

---

[1] Plaintiff's Response mentions only Stewart as a similarly situated employee, and that is the only employee this Court considers. A single line suggestion in a completely different portion of the Response (Dkt. 31, pg. 25) does not sufficiently raises the existence of an additional similarly situated employee.

15

violations occurred. Both the Council Auditor and Mousa believed that Plaintiff's day-to-day responsibility for the programs he administered was a determinative factor in their recommendation or decision that he should be investigated and potentially disciplined. In contrast, the auditors found that none of the persons named in Audit #779, including Stewart, had violated City law, policies or ethical rules.

Accordingly, this Court concludes that Plaintiff has failed to establish a prima facie case of race discrimination. Consequently, this Court need go no further with the *McDonnell Douglas* analysis, and the City is entitled to summary judgment.[2]

### B. Municipal Liability

The City maintains Plaintiff cannot hold it liable under § 1983. A municipality can be liable, under § 1983, "only when the deprivation at issue was undertaken pursuant to city 'custom' or 'policy,' and not simply on the basis of *respondeat superior.*" *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1479–80 (11th Cir. 1991). A plaintiff can recover from a municipality for "acts that are, properly speaking, acts of the municipality—that is, acts which the municipality has officially sanctioned or ordered." *Id.* (internal quotations removed). Municipality liability must be based on more than "'a theory of respondeat superior.'" *Brown v. Crawford,* 906 F.2d 667, 671 (11th Cir.1990) (quoting *H.C. by Hewett v. Jarrard*, 786 F.2d 1080, 1086 (11th Cir.1986)).

---

[2] Based on this determination this Court need go no further in the *McDonnell Douglas* framework. However, were this Court to continue the analysis, the City has proffered a legitimate reason for Plaintiff's reversion to civil service, but Plaintiff has failed to sustain his burden to present sufficient evidence that the City's assertion for his reversion was false. *See Burdine*, 450 U.S. at 256; *Reeves*, 530 U.S. at 143.

In other words, "'It is only when the execution of the government's policy or custom

inflicts the injury that the municipality may be held liable under § 1983.'" *Gold v. City of Miami*,

151 F.3d 1346, 1350 (11th Cir. 1998) (quoting *City of Canton v. Harris*, 489 U.S. 378, 385

(1989)). A "single illegal act" can form the basis for § 1983 liability but "only when the

challenged act may fairly be said to represent official policy, such as when that municipal officer

possesses final policymaking authority over the relevant subject matter." *Scala v. City of Winter*

*Park*, 116 F.3d 1396, 1397 (11th Cir. 1997). This Court is mindful that "a 'municipal act' is not,

however, limited to decisions made by the city's official legislative body or in written

agreements. City policy also may be implicated by the acts of individual policymaking officials

or by pervasive city custom." *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1480 (11th Cir.

1991).

Plaintiff has not set forth any facts or evidence which demonstrate the City has an

official, racially discriminatory policy or widespread custom or practice that meets the criteria

for holding a municipality liable. While Mousa had final policymaking authority at the City,

Plaintiff has failed to present any evidence that Mousa acted out of a racially discriminatory

motive. Instead, the only person Plaintiff has claimed acted out of a racially discriminatory

motive was Stagner—not the ultimate decision-maker.

There is no factual support for Plaintiff's conclusory assertion that the City has "a

systemic and widespread" policy, custom or practice of racial discrimination. The City's written

directives prohibiting discrimination are widely disseminated to employees and posted on the it's

website. Plaintiff, a black male, was hired by the City and was repeatedly promoted or appointed

during his employment. Plaintiff's two white supervisors appointed or approved Plaintiff's

appointment to the position of AHC at an advanced pay rate. Further, Plaintiff was replaced by

Coles, a black female, who was appointed to the position of AHC after serving as the SHIP Administrator for years and the former Chief of the Division, Spencer, is black. While Plaintiff claims Stagner discriminated against him, he admitted that he cannot say that Stagner or the City has a practice of discriminating against other black employees, and Stagner was not a final policy-maker at the City. The City has accepted the resignations, removed, reverted, investigated and disciplined both white and black employees. The Council Auditors have also recommended the investigation or discipline of white and minority employees and there is no evidence that their recommendation with regard to Plaintiff was based on race. Thus, Plaintiff cannot establish the City has widespread or systemic policy, practice or custom of racial discrimination. Accordingly, since Plaintiff has failed to show an unreviewable, discriminatory well-settled and widespread policy, the City is not subject to liability under §1983, but is instead entitled to summary judgment.

### C. Qualified Immunity

Stanger requests summary judgment on qualified immunity grounds. Qualified immunity protects government officers sued in their individual capacity from liability for civil damages so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have know." *Vineyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002). Qualified immunity allows "government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotations and citations removed).

To be eligible for this immunity, the public officer "must first prove that he was acting within the scope of his discretionary authority when the alleged wrongful acts occurred." *Lee*,

284 F.3d at 1194 (internal quotations removed). As there is no dispute that Stagner was acting in her discretionary capacity, the burden shifts to Plaintiff to "to show that qualified immunity is not appropriate." *Id.* To meet this responsibility, a plaintiff "must meet the two-part standard reaffirmed by the Supreme Court in *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)." *Terrell v. Smith*, 668 F.3d 1244, 1250 (11th Cir. 2012). A plaintiff must, first, "allege facts that establish that the officer violated [the plaintiff's] constitutional rights; and second, the plaintiffs must also show that the right involved was 'clearly established' at the time of the putative misconduct." *Id.* Such an examination "is 'undertaken in light of the specific context of the case, not as a broad general proposition.'" *Id.* (citing *Lee*, 284 F.3d at 1194). Of course, as *Pearson* mades clear, the two pronged approach is not "mandatory in all cases . . . ." *Pearson*, 555 U.S. at 236.

Plaintiff alleges that Stagner should be held individually liable for Plaintiff's demotion under the "cat's paw" theory of liability. Stagner's role, according to Plaintiff, in preparing the audit responses and withholding the fact that Plaintiff did not violate a work rule constituted a biased recommendation. According to Plaintiff, there was no legitimate justification for withholding such information from Mousa or the Council Auditor's office. Furthermore, despite knowing about the self-performance policy since as early as 2009, Stagner never disciplined any of the white Rental Rehabilitation Project Managers, like Plaintiff, who did not follow the procurement code, like Herzog.

The "cat's paw" theory is a method of proving discriminatory animus. *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999). This theory holds that an employer may be held liable if the decision-maker relies on the biased recommendation of a subordinate. "This theory provides that causation may be established if the plaintiff shows that the decisionmaker

19

followed the biased recommendation without independently investigating the complaint against the employee. In such a case, the recommender is using the decisionmaker as a mere conduit, or 'cat's paw' to give effect to the recommender's discriminatory animus." *Id.* at 1332.

Plaintiff faults Stagner for intentionally withholding the draft audit from him and not giving him a chance to respond, failing to inform the auditors that a self-performance policy existed, and for signing off on contracts violating the Procurement Code. However, none of those allegations establish a clearly established constitutional right. As an appointed, at-will employee, Plaintiff was not entitled to a certain process and, to the extent he was, he received all the due process he was entitled to under the law. Plaintiff had the opportunity to respond to the auditor's preliminary findings and to submit a response during the HR investigation, yet he did not. As Plaintiff and Stagner were colleagues on the same level, Stagner had no duty or responsibility to provide exonerating information on Plaintiff's behalf or protect him from the ramifications of his own conduct. Nor would a reasonable government official in Stagner's position have been aware that such a right existed. Plaintiff's allusions to "abstract" rights is not enough to survive a motion for summary judgment.

In this case, since Plaintiff cannot show direct causation, Stagner is entitled to qualified immunity. After full discovery, Plaintiff has failed to present any evidence from which a reasonably jury could conclude that Stagner had discriminatory animus against him because he is black, and the fact that Stagner is white and Plaintiff is black is not proof of a discriminatory motive. *See Holifield*, 115 F.3d at 1564 (plaintiff's "opinion, without more, is not enough" to prove race discrimination). Plaintiff has presented no evidence that Stagner recommended or was even involved in Mousa's decision to remove and revert him or that Mousa's decision was just a "cat's paw" for Stagner's recommendation. The recommendation to investigate Plaintiff and

20

potentially discipline him came from the Council Auditors and not from Stagner. Thus, even if Plaintiff could show Stagner made a recommendation to Mousa, Plaintiff cannot show that the recommendation, and not the underlying audit, was the reason for Mousa's decision. Mousa, in fact, explained Stagner did not influence him in any way. Stagner was not involved in any of the discussions or meetings regarding what action the City should take about Plaintiff's employment. Mousa had the sole authority and discretion, based on the authority granted to him by the Mayor in his position as CAO, to accept Plaintiff's resignation. Therefore, Plaintiff cannot rely on the "cat's paw" theory to prove his claim against Stagner and she is entitled to qualified immunity.

**IV. Conclusion**

Based on the above, this Court concludes that the City and Stanger's "Motion for Final Summary Judgment and Accompanying Memorandum of Law" should be granted and Judgment entered in their favor.

Accordingly, it is **ORDERED**:

1. Defendants' "Motion for Final Summary Judgment and Accompanying Memorandum of Law" (Dkt. 24) is **GRANTED**; and

2. The Clerk is directed to enter Judgment in favor of Defendants; and close this case.

**DONE AND ENTERED** at Jacksonville, Florida, this /4  day of August, 2017.

**HARVEY E. SCHLESINGER**
UNITED STATES DISTRICT JUDGE

Copies to:
Jesse B. Wilkison, Esq.
Wendy E. Byndloss, Esq.

21