[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-13961
Non-Argument Calendar
_____

D.C. Docket No. 3:15-cv-01209-HES-MCR

DARRELL GRIFFIN,

          Plaintiff-Appellant,

versus

CITY OF JACKSONVILLE, FLORIDA,
LAURA STAGNER,
individually,

          Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(March 15, 2019)

Before ED CARNES, Chief Judge, MARTIN, and ANDERSON, Circuit Judges.

MARTIN, Circuit Judge:

Darrell Griffin sued the City of Jacksonville, Florida (the "City") and Laura Stagner in her individual capacity under 42 U.S.C. §§ 1981 and 1983. Mr. Griffin claims the City discriminated against him on the basis of race when it demoted him due to actions revealed in an audit conducted by the City. He also claims Ms. Stagner discriminated against him by failing to reveal a policy that rendered his actions permissible. The District Court granted summary judgment for the City and Ms. Stagner, and Mr. Griffin timely appealed. After careful consideration, and with the benefit of oral argument, we affirm.

## I.

Mr. Griffin, an African American male, was appointed Affordable Housing Coordinator for Jacksonville's Housing and Community Development Division (the "Division") in 2007. As the Affordable Housing Coordinator, Mr. Griffin administered grant funding from the State Housing Initiatives Partnership to developers for rehabilitation of low-incoming housing through the City's Rental Rehabilitation Program. In this role, Mr. Griffin reviewed each developer's application for compliance with the City's Procurement Code and the terms of the City's grant agreements. He would then turn over the application to the Division's finance team to determine if funding was feasible. If funding was available, the

2

Director of the Division would approve the application, and the developer and the City would enter into a grant agreement.

Section 126.110 of the City's Procurement Code prohibited conflicts of interest for contracts to which the City is a party. Section 126.110 was memorialized in the grant agreements as Section 12.15 (Conflict of Interest), which prohibited developers from hiring contractors or subcontractors if the developer exercised any control over the contractor or subcontractor, or if the developer had any financial interest in the contractor or subcontractor. The grant agreements also contained Section 12.19 (Procurement), which required developers to solicit a certain number of quotes or undergo a formal bidding process depending on the cost associated with the contracted work or supplies.

The Council Auditor's Office conducted an audit ("Audit #769") of the funds disbursed through the State Housing Initiatives Partnership between October 1, 2009 and September 30, 2012. During this time, Mr. Griffin was responsible for overseeing the grant agreements that were funded through the State Housing Initiatives Partnership and the Rental Rehabilitation Program.

The preliminary findings of Audit #769 were that Mr. Griffin failed in his compliance responsibilities. In four of the nine audited grant agreements covering the period Mr. Griffin oversaw, the developer was not in compliance with Section 12.15 of the grant agreement. And in all nine of the reviewed grant agreements,

developers had not solicited the number of quotes required by Section 12.19 for the contracted work.

Mr. Griffin contends he did not enforce Section 12.15 of the grant agreements because the Division had a "self-performance" policy. As he describes this unwritten policy, the City allowed not-for-profit developers who were also contractors to perform the work themselves or delegate the work to a general contractor the not-for-profit developer kept on staff. In both contexts, the developer has a financial interest in the contractor which violates Section 12.15. Mr. Griffin says the "self-performance" policy was "normal practice" in the City, and all Division employees were aware of it. But the Rental Rehabilitation Program Guidelines make no mention of the "self-performance" policy, and Mr. Griffin did not submit any written documentation showing that the "self-performance" policy was followed in the State Housing Initiatives Partnership or the Rental Rehabilitation Program. Similarly, to justify his nonenforcement of Section 12.19, Mr. Griffin also claims the Division had a policy of not following the quote requirement.

The Council Auditor's Office conducted an exit interview with Mr. Griffin in October 2014 to discuss Audit #769's preliminary findings. Mr. Griffin agreed with the preliminary findings that Sections 12.15 and 12.19 had not been followed in a number of the grant agreements he oversaw. He informed the Council

Auditor's Office of the Division's "self-performance" policy but explained the "self-performance" policy was no longer in place.[1] And he did not provide any documentation of the "self-performance" policy to the Council Auditor's Office.

Using Mr. Griffin's responses from the exit interview, the Council Auditor's Office completed a draft audit report on April 25, 2014. The draft audit report restated the audit's preliminary conclusion: Mr. Griffin allowed a number of violations of Sections 12.15 and 12.19 in the grant agreements. It also recommended "the [City] investigate and determine whether any disciplinary action of [Mr. Griffin] would be warranted."

After the draft audit report was finalized, the City elected a new mayor, Lenny Curry, who was set to assume office on July 1, 2015. By custom, all appointed City employees are required to submit resignation letters when a new mayor is elected. Once each appointed employee submits a resignation letter, the new mayoral administration reviews each of them and determines whether to keep the employee in their appointed position. If the new administration elects to accept an appointed employee's resignation, the employee "reverts" back to the civil service position they held before their appointment if it is available.

---

[1] Although the auditor from the Council Auditor's Office who conducted the exit interview cannot remember Mr. Griffin mentioning the "self-performance" policy, Mr. Griffin testified he informed the auditor "that[] [the "self-performance" policy is] not [the Division's] policy anymore."

In keeping with this practice, Mr. Griffin received an email on May 29, 2015 addressed to all appointed employees and instructing them to submit a letter of resignation to Mayor Curry's administration.  The email explained that if the appointed employee wanted to stay in his appointed position under the new administration, he should include a resume along with his resignation letter.  It also implied that an appointed employee could forgo submitting a resume and instead opt to revert back to his original civil service position.  Mr. Griffin decided he would like to continue in his appointed position.  As instructed, he submitted a resignation letter together with his resume on June 4, 2015.

In early August 2015, the Council Auditor's Office brought a copy of the draft audit report directly to Sam Mousa, Mayor Curry's Chief Administrative Officer.[2]  Mr. Mousa reviewed the report and then met with Ms. Stagner, the head of the Division's finance team who was, at the time, also serving as the Interim Chief of the Division.  The Division was required to submit responses to the draft audit.  After receiving responses, the Council Auditor's Office would publish the audit's final results online.  Mr. Mousa asked Ms. Stagner to "take the lead" on the Division's responses to the draft audit.  Ms. Stagner did not give a copy of the draft

---

[2] Mr. Mousa testified that the Council Auditor's Office first gave him the draft audit report in August or September 2015.   But it must have been early August 2015 because, as set out later in this opinion, Mr. Mousa took documented action on the draft audit report on August 3, 2015.

6

audit findings to Mr. Griffin, even though draft audit findings were typically distributed to each affected program manager.

Before the Division's responses to the draft audit report were finalized, Mr. Mousa met with Folks Huxford, the Acting Director of the Planning Department, which oversaw the Division. Mr. Mousa asked Mr. Huxford to present Mr. Griffin with two options: (1) either resign from his position as the Affordable Housing Coordinator or (2) be placed on administrative leave while an investigation was conducted. Mr. Huxford met with Mr. Griffin and presented Mr. Griffin with the two options, which he explained were in response to the audit. Ms. Stagner and others were also present at the meeting. Mr. Griffin opted to be placed on administrative leave and have the investigation go forward.

Mr. Mousa was responsible for reviewing the resignation letters submitted due to the change in mayoral administration. He decided whether each appointed employee would stay in their position. Mr. Mousa reviewed Mr. Griffin's resignation letter on September 3, 2015, after Mr. Griffin elected to go on administrative leave. Mr. Mousa decided to accept Mr. Griffin's resignation because of the draft audit report's findings. Mr. Mousa testified there were no other factors involved in the decision to demote Mr. Griffin. He also said it was solely his decision to accept Mr. Griffin's resignation. As a result of having his resignation accepted, Mr. Griffin reverted back to the civil service position of

Recreation, Planning and Grants Coordinator in the City's Parks, Recreation and Community Services Department. This caused his salary to decrease by $36,000.

After Mr. Mousa accepted Mr. Griffin's resignation, the Division submitted its responses to the draft audit on September 15, 2015. The Division "acknowledge[d]" the Council Auditor's Office's findings regarding Mr. Griffin's violations of Sections 12.15 and 12.19 and stated it was "currently pursuing disciplinary action against" Mr. Griffin that "may include up to termination." According to Mr. Mousa, Ms. Stagner "had nothing to do with the final decision [to] discipline" Mr. Griffin. Instead, Mr. Mousa had reached a consensus with the City's Office of General Counsel and his assistant to discipline Mr. Griffin.

After he was demoted, Mr. Griffin filed suit against the City and Ms. Stagner in her individual capacity. Mr. Griffin made a claim of race discrimination against the City and Ms. Stagner under §§ 1981 and 1983, alleging he was demoted from his position as Affordable Housing Coordinator because of his race. The City and Ms. Stagner moved for summary judgment, and the District Court granted their motion. The District Court found Mr. Griffin failed to establish a prima facie case of discrimination and Ms. Stagner was entitled to qualified immunity. Mr. Griffin then timely filed this appeal.

## II.

We review de novo the grant of summary judgment. Alvarez v. Royal Atl. Developers, Inc., 610 F.3d 1253, 1263 (11th Cir. 2010). "We will affirm if, after construing the evidence in the light most favorable to the non-moving party, we find that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." Id. at 1263–64; Fed. R. Civ. P. 56(a). "We may uphold the district court's grant of summary judgment on any basis supported by the record." McCullum v. Orlando Reg'l Healthcare Sys., Inc., 768 F.3d 1135, 1141 (11th Cir. 2014).

## III.

We first address Mr. Griffin's § 1981 claim against the City.[3] Mr. Griffin may establish discrimination through direct evidence, circumstantial evidence, or statistical proof. Alvarez, 610 F.3d at 1264. He relies solely on evidence of discrimination through comparators, which is considered circumstantial evidence. See Smith, 644 F.3d at 1327–28, 1328 n.24. We therefore apply the burden-

---

[3] Claims of race discrimination under § 1981 are analyzed in the same manner as claims brought under Title VII. Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1325 n.14 (11th Cir. 2011)

9

shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973).[4]  Alvarez, 610 F.3d at 1264.

Under the McDonnell Douglas framework, the "plaintiff bears the initial burden of establishing a prima facie case, which creates a rebuttable presumption of discriminatory intent." Flournoy v. CML-GA WB, LLC, 851 F.3d 1335, 1339 (11th Cir. 2017). The "[d]efendant must then rebut that presumption by producing evidence of a legitimate, nondiscriminatory reason for its action." Id. "If [the] defendant bears its burden of production, [the] plaintiff must establish that [the] defendant's proffered reason is but a pretext for unlawful discrimination." Id.

To establish a prima facie case of discriminatory termination through circumstantial evidence under McDonnell Douglas, a plaintiff must show that: "(1) []he belongs to a protected class; (2) []he was subjected to adverse employment action; (3) [his] employer treated similarly situated employees outside [his] classification more favorably; and (4) []he was qualified to do the job." Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1091 (11th Cir. 2004).

---

[4] Establishing the elements of the McDonnell Douglas framework is not the only way to survive summary judgment in an employment discrimination case. A plaintiff may also present "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." Smith, 644 F.3d at 1328 (quotation marks and footnote omitted). Mr. Griffin did not raise this method before the District Court, and he does not argue it on appeal. We therefore decline to consider it. See Ramirez v. Sec'y, U.S. Dep't of Transp., 686 F.3d 1239, 1249–50 (11th Cir. 2012).

To show the City treated similarly situated employees outside his classification more favorably, Mr. Griffin points to another audit ("Audit #779") that the Council Auditor's Office conducted. Audit #779 reviewed a purchase order and contract made between the Division and a private vendor for affordable housing development technical assistance and consulting services. The purchase order between the Division and the private vendor initially covered the time period between March 1, 2007 and September 30, 2008, and was authorized up to $85,000. The contract between the parties covered a period between April 7, 2009 and September 30, 2009 and was authorized up to $98,000.

Audit #779 found that the award of the purchase order did not comply with the City's Procurement Code. The initial award was set up as a "sole source" no-bid purchase order, meaning that it waived the City's competitive bidding requirements. "Sole source" contract awards are permissible under the City's Procurement Code only when the requesting agency believes no other vendor could perform the services. To comply with this requirement, the award of a sole source contract had to be accompanied by a letter explaining why only one particular vendor could perform the services. Audit #779 found that the letter accompanying the award of the contract failed to properly justify why only that private vendor could perform the consulting services.

Audit #779 also found that the contract between the parties was amended four times to extend the contract end date from September 30, 2009 to September 30, 2012.  To fund the extensions, money was siphoned away from other City projects, including $400,000 from a project specifically requested by one of the City's Council Members.  As a result, the maximum indebtedness under the contract increased to $868,000—almost nine times larger than the amount originally authorized.  Despite the increases in funding for the contract, the scope of the services governed by the contract never increased.  Audit #779 found these amendments were improper and violated the City's procurement policies.  And Audit #779 recommended more than $300,000 be returned to the Council Member's bond account.

Three white City employees—Kerri Stewart, Wight Greger, and John Pappas—were involved in the purchase order and contract described in Audit #779.  First, Ms. Stewart initiated the purchase order with the private vendor and was considered the "point person in the decisionmaking" regarding the purchase order.  Second, Ms. Greger directly requested funding be siphoned away from other projects, including the City's Council Member's project, to fund the consulting services contract.  Last, Mr. Pappas sent Ms. Greger's requests for funding to be reallocated toward the contract.

Mr. Griffin argues Ms. Stewart, Ms. Greger, and Mr. Pappas are similarly situated to him in all relevant respects. He claims Audit #779 accused them of conduct more egregious than his, but they were not disciplined in any way. Mr. Griffin argues that, as a result, a jury could infer the City treated employees outside of his classification more favorably.

To be an adequate comparator, the preferentially treated person from outside the plaintiff's protected class must be similarly situated to the plaintiff in all material respects. See Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997) (per curiam). To be "similarly situated," the comparator employee must have been "involved in or accused of" the same basic conduct, yet "disciplined in different ways" for that conduct. Id. "The most important factors in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed." Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999) (quotation marks omitted).

None of Mr. Griffin's proffered comparators are similarly situated to him in all material respects. See Holifield, 115 F.3d at 1562. First, Audit #779 did not specifically accuse Ms. Stewart of violating any of the City's Procurement Codes or conflict of interest policies.[5] Although she may have been the "point person in

---

[5] Mr. Griffin claims either Ms. Stewart or Ms. Greger sat on a subcommittee that Audit #779 accused of "[]partiality." But Mr. Griffin cannot say with certainty that Ms. Stewart or Ms. Greger were on the subcommittee. "Speculation does not create [a] genuine issue of fact."

13

the decisionmaking" regarding the purchase order, the ultimate decision to award the purchase award to the private vendor was made by a five-person committee at a public meeting. Because this decision was made by a five-person committee, we cannot say that any one member of that committee was solely responsible for it. In contrast, Mr. Griffin was solely responsible for overseeing the grant agreements, and Audit #769 specifically pointed to him as the person responsible for allowing violations of Section 12.15.

Further, Audit #779 accused the committee of failing to justify why the private vendor was the City's only option for affordable housing development technical assistance and consulting services. If the committee had properly justified its decision, the initial sole source award may have been permissible under the City's Procurement Code. In contrast, it was never permissible in the grant agreements Mr. Griffin oversaw for quotes or bids to not be solicited. There was no waiver process to justify not soliciting these quotes or bids. Given these key distinctions, Ms. Stewart did not engage in the same conduct as Mr. Griffin. See Holifield, 115 F.3d at 1562. She is therefore not an appropriate comparator to establish discrimination by the City because she is not similarly situated to Mr. Griffin in all material respects. See id.

---

Hornsby-Culpepper v. Ware, 906 F.3d 1302, 1314 (11th Cir. 2018) (quotation marks and emphasis omitted). The City is therefore entitled to summary judgment on this issue.

Neither are Ms. Greger or Mr. Pappas apt comparators. When Audit #779 was finalized in March 2016, Ms. Greger was no longer employed by the City. There was thus no opportunity for the City to discipline her. She therefore could not be "disciplined in [a] different way[]" than Mr. Griffin and, as a result, cannot be considered similarly situated to him. See id. Mr. Pappas is no better comparator. Audit #779 accused him only of sending Ms. Greger's requests for funds to be reallocated toward the contract amendments. It does not accuse him of failing to follow any of the City's ordinances or policies. Neither does it accuse him of breaking any conflict of interest rules or quote or bidding requirements. Thus, Mr. Pappas and Mr. Griffin were not involved in the same conduct. See id.

In sum, all three of Mr. Griffin's proffered comparators are different in some material respect. And because Mr. Griffin has not shown that the City treated any similarly situated employee outside of his classification more favorably, he cannot establish a prima facie case of race discrimination under McDonnell Douglas. See Wilson, 376 F.3d at 1092. We therefore affirm the District Court's grant of summary judgment to the City.

### IV.

In addition to his claim against the City, Mr. Griffin also argues Ms. Stagner discriminated against him by failing to reveal the "self-performance" policy when

she drafted the audit responses. He seeks to hold her individually liable for her actions under § 1983 through a cat's paw theory of liability.

The cat's paw theory is typically understood to create employer liability under either § 1981 or § 1983 when the employer relies on an improperly motivated recommendation by a subordinate and does not independently investigate the recommendation. See Crawford v. Carroll, 529 F.3d 961, 979 n.21 (11th Cir. 2008); Quinn v. Monroe County, 330 F.3d 1320, 1327 (11th Cir. 2003); Stimpson v. City of Tuscaloosa, 186 F.3d 1328, 1332 (11th Cir. 1999) (per curiam). Under this theory of liability, an employer found to have acted in a nondiscriminatory manner can still face liability for "rubber stamp[ing]" its employee's discriminatory recommendation. Stimpson, 186 F.3d at 1332; Quinn, 330 F.3d at 1327 ("A decision-maker may serve as the conduit of the subordinate's improper motive, for example, if he merely rubber-stamps the recommendation of a subordinate." (quotation marks omitted)).

However, Mr. Griffin does not seek to apply the cat's paw theory of liability in the typical manner against his employer, the City. Instead, he argues it can be used to hold Ms. Stagner individually liable. Our review indicates that this Court has published an opinion allowing for individual liability under the cat's paw theory only once in Quinn. See 330 F.3d at 1327. In Quinn, a former library director sued a county and a county administrator under § 1983 for First

Amendment retaliation. Id. at 1322–24. The county administrator had the power to both recommend the library director's termination and terminate her. Id. at 1328. And her termination was reviewable by the county's Career Services Council. Id. This Court held the county was not subject to municipal liability because the county administrator's acts were reviewable by the Career Services Council, but the county administrator could be individually liable for his recommendation and termination of the library director under § 1983. Id. at 1326–28.

Under our precedent, Ms. Stagner's actions are not enough to confer individual liability under the cat's paw theory. Quinn shows that cat's paw liability is appropriate only when a person took some sort of action—for example, making a termination recommendation—that led to the adverse action against the plaintiff. See id. at 1327. Ms. Stagner did no such thing. At best, we can say that she failed to save Mr. Griffin from adverse action by not raising the "self-performance" policy. The record also reveals that Mr. Mousa acted in response to the draft audit report and that the decision to demote Mr. Griffin was a product of a consensus reached between him, his assistant, and the City's General Counsel's Office. There is no evidence to suggest Ms. Stagner's involvement in authoring the draft audit responses influenced Mr. Mousa's decision to accept Mr. Griffin's resignation. See Crawford, 529 F.3d at 979 n.21 (suggesting cat's paw liability

17

requires evidence of a casual connection between the person or entity who subjected a plaintiff to adverse employment action and the person or entity who rubber stamped that adverse action).  As a result, Ms. Stagner did not act as a "cat's paw" whose affirmative steps influenced or were otherwise causally connected to Mr. Griffin's demotion.  On these facts, Ms. Stagner cannot be held individually liable under § 1983.[6]

**AFFIRMED.**

---

[6] Because we may affirm on any basis in the record, we need not decide whether Mr. Griffin suffered an adverse employment action by the City or Ms. Stagner is entitled to qualified immunity.  McCullum, 768 F.3d at 1141; Mink v. Smith & Nephew, Inc., 860 F.3d 1319, 1324 (11th Cir. 2017).

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

March 15, 2019

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number: 17-13961-GG
Case Style: Darrell Griffin v. City of Jacksonville, Florida, et al
District Court Docket No: 3:15-cv-01209-HES-MCR

**This Court requires all counsel to file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause.** Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1.

Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for writ of certiorari (whichever is later) via the eVoucher system. Please contact the CJA Team at (404) 335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

Pursuant to Fed.R.App.P. 39, costs taxed against appellant.

Please use the most recent version of the Bill of Costs form available on the court's website at www.ca11.uscourts.gov.

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature block below. For all other questions, please call Joe Caruso, GG at (404) 335-6177.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Jeff R. Patch
Phone #: 404-335-6161

OPIN-1A Issuance of Opinion With Costs